**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by Letitia James, Attorney General of the State of New York, | Case No. 1:26-cv-00991-VSB |
| Plaintiff, | Oral Argument Requested |
| v. | |
| ROBERT G. KRAMER | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION TO REMAND**

Kirby Behre (*admitted pro hac vice*)
kbehre@milchev.com
Alexandria M. Westbrook (NYSB #6168736)
awestbrook@milchev.com
Robert Cetrino (*pro hac vice motion forthcoming*)
rcetrino@milchev.com
Jesse Schwab (*pro hac vice motion forthcoming*)
jschwab@milchev.com
**MILLER & CHEVALIER CHARTERED**
900 16th Street Northwest
Washington, DC 20006
Telephone: (202) 626-5800
Facsimile: (202) 626-5801

Roland G. Riopelle (NYSB #2068161)
rriopelle@sercarzandriopelle.com
**SERCARZ & RIOPELLE, LLP**
950 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 586-4900
Facsimile: (212) 586-1234

*Attorneys for Defendant Robert G. Kramer*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

    A.    The Global Pandemic & Operation Warp Speed .................................................. 2

    B.    Federal Government Oversight and the September 2020
        Contamination ...................................................................................................... 4

    C.    Mr. Kramer's Company-Approved Trading Plan ................................................. 5

    D.    The NYAG's Settlement with Emergent ............................................................... 5

STANDARD OF REVIEW ................................................................................................... 7

ARGUMENT ......................................................................................................................... 7

I.      REMOVAL IS APPROPRIATE UNDER 28 U.S.C. § 1442(a)(1) ................................... 8

    A.    Mr. Kramer "Acted Under" a Federal Officer ..................................................... 7

    B.    Plaintiff's Claim "Relates To" Federally Directed Work Performed
        Under Government Contracts .............................................................................. 11

II.    REMOVAL IS APPROPRIATE BECAUSE THE COURT HAS
      FEDERAL QUESTION JURISDICTION ........................................................................ 13

    A.    The Martin Act Claim Necessarily Raises Federal Issues. .................................. 13

    B.    There Is a Dispute Regarding Compliance with 17 C.F.R.
        § 240.10b5-1 ....................................................................................................... 15

    C.    The Federal Issues Are Substantial ..................................................................... 17

    D.    Exercising Jurisdiction Will Not Disrupt the Federal-State Judicial
        Balance ................................................................................................................ 19

    E.    Plaintiff's "Federal Defense" Argument Mischaracterizes the
        Issues .................................................................................................................. 20

III.   THIS COURT HAS ORIGINAL DIVERSITY JURISDICTION OVER
      THIS ACTION ................................................................................................................ 21

A.  The Complaint Seeks Redress for Harm to New York Citizens............................22

B.  The Complaint Seeks to Address Investor Harm.....................................................23

C.  There Is No "Real and Substantial" State Interest.................................................24

IV.  IN THE ALTERNATIVE, MR. KRAMER SHOULD BE ALLOWED
LIMITED DISCOVERY ON JURISDICTION ...............................................................26

CONCLUSION.........................................................................................................................27

WORD COUNT CERTIFICATION ........................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*New York ex rel. Abrams v. Gen. Motors Corp.*,
547 F. Supp. 703, 703-04 & n.4 (S.D.N.Y. 1982) .................................................................25

*Agyin v. Razmzan*,
986 F.3d 168 (2d Cir. 2021)...........................................................................................7, 8, 11

*Anwar v. Fairfield Greenwich Ltd.*,
No. 09-cv-0118, 2009 WL 1181278 (S.D.N.Y. May 1, 2009) ...............................................26

*Badilla v. Midwest Air Traffic Control Serv., Inc.*,
8 F.4th 105 (2d Cir. 2021) .......................................................................................................8

*Barone v. Bausch & Lomb, Inc.*,
372 F. Supp. 3d 141 (W.D.N.Y. 2019) ...................................................................................16

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
25 F.4th 1238 (10th Cir. 2022) .......................................................................................8, 9, 11

*Bd. of Managers of 17 Battery Place Condo. v. Twin City Fire Ins. Co.*,
No. 24-cv-9972, 2025 WL 804830 (S.D.N.Y. Mar. 12, 2025)...............................................26

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005).......................................................................................15, 16, 17

*Callahan v. Sw. Airlines Co.*,
No. 18-cv-10563, 2018 WL 5849476 (D. Mass. Sept. 26, 2018), *report and*
*recommendation adopted*, 2018 WL 5846819 (D. Mass. Nov. 7, 2018)................................16

*Cantor Fitzgerald, L.P. v. Peaslee*,
88 F.3d 152 (2d Cir. 1996).....................................................................................................26

*Colavito v. N.Y. Organ Donor Network, Inc.*,
438 F.3d 214 (2d Cir. 2006)....................................................................................................21

*Connecticut Comm'r of Lab. v. AT&T Corp.*,
No. 06-cv-01257, 2006 WL 3332982 (D. Conn. Nov. 16, 2006)...........................................22

*Connecticut v. Chubb Grp. of Ins. Cos.*,
No. 11-cv-00997, 2012 WL 1110488 (D. Conn. Mar. 31, 2012) ...........................................22

*Cuomo v. Crane Co.*,
771 F.3d 113 (2d Cir. 2014).....................................................................................................8

*D'Alessio v. N.Y. Stock Exch., Inc.*,
   258 F.3d 93 (2d Cir. 2001)............................................................................................14

*Dep't of Fair Emp. & Housing v. Lucent Techs., Inc.*,
   642 F.3d 728 (9th Cir. 2011) ...............................................................................21, 23, 25

*In re Emergent BioSolutions Inc. Secs. Litig.*,
   No. 21-cv-955 (D. Md. Feb. 27, 2025), Dkt No. 213 ...........................................................24

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)...............................................................................................6, 13

*Fed. Ins. Co. v. Tyco Int'l Ltd.*,
   422 F. Supp. 2d 357 (S.D.N.Y. 2006)...............................................................................26

*Finkielstain v. Seidel*,
   857 F.2d 893 (2d Cir. 1988)..........................................................................................22

*Goins v. Saint Elizabeth Med. Ctr., Inc.*,
   No. 22-6070, 2024 WL 229568 (6th Cir. Jan. 22, 2024).........................................8, 9, 10, 11

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005)................................................................................................ *passim*

*Grace Ranch, LLC v. BP Am. Prod. Co.*,
   989 F.3d 301 (5th Cir. 2021) .........................................................................................25

*Gunn v. Minton*,
   568 U.S. 251 (2013)..........................................................................................13, 16, 17

*Louisiana ex rel. Guste v. Fedders Corp.*,
   524 F. Supp. 552 (M.D. La. 1981)...........................................................................21, 22, 24

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
   571 U.S. 161 (2014)...................................................................................................21

*Isaacson v. Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008)........................................................................................7, 12

*New York ex rel. Jacobson v. Wells Fargo Nat'l Bank N.A.*,
   824 F.3d 308 (2d Cir. 2016)........................................................................................ *passim*

*Kircher v. Putnam Funds Tr.*,
   547 U.S. 633 (2006).....................................................................................................7

*Krandle v. Refuah Health Ctr., Inc.*,
   No. 22-CV-4977, 2023 WL 2662811 (S.D.N.Y. Mar. 28, 2023).......................................8, 12

*Latiolais v. Huntington Ingalls Inc.*,
    951 F.3d 286 (5th Cir. 2020) ...................................................................8, 11

*Legg v. Wyeth*,
    428 F.3d 1317 (11th Cir. 2005) .......................................................................6

*Link Motion Inc. v. DLA Piper LLP*,
    103 F.4th 905 (2d Cir. 2024) ........................................................................19

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998)............................................................................14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia*,
    311 F. Supp. 149 (S.D.N.Y. 1970) .........................................................23, 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*,
    578 U.S. 374 (2016)......................................................................................14

*Mihok v. Medtronic, Inc.*,
    119 F. Supp. 3d 22 (D. Conn. 2015)............................................................16

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012)........................................................................................6

*Missouri, Kan. & Tex. Ry. Co. v. Hickman*,
    183 U.S. 53 (1901).................................................................................23, 25

*N.Y.C. Health & Hosps. Corp. v. WellCare of N.Y., Inc.*,
    769 F. Supp. 2d 250 (S.D.N.Y. 2011)..........................................................16

*NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*,
    770 F.3d 1010 (2d Cir. 2014).................................................................17, 19

*Navarro Sav. Ass'n v. Lee*,
    446 U.S. 458 (1980)......................................................................................21

*Ex parte Nebraska*,
    209 U.S. 436 (1908)......................................................................................21

*New York v. Arm or Ally, LLC*,
    644 F. Supp. 3d 70 (S.D.N.Y. 2022).......................................................15, 19

*Ohio v. GMAC Mortg., LLC*,
    760 F. Supp. 2d 741 (N.D. Ohio 2011).........................................................22

*People v. Florentino*,
    116 Misc. 2d 692 (Crim. Ct. N.Y. Cnty. 1982) ...........................................20

*People v. Napolitano*,
   282 A.D.2d 49 (1st Dep't 2001) .........................................................................................20

*Ramada Inns, Inc. v. Rosemount Mem'l Park Ass'n*,
   598 F.2d 1303 (3d Cir. 1979).............................................................................................25

*In re Regeneron Pharms., Inc.*,
   Nos. 25-cv-05056 et al., 2026 WL 734839 (S.D.N.Y. Mar. 16, 2026) .......................15, 16, 17

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) .............................................................................................11

*SEC v. Brewer*,
   No. 20-cv-06175, 2025 WL 1548765 (S.D.N.Y. May 30, 2025) ...........................................15

*Skandia Am. Reins. Corp. v. Schenck*,
   441 F. Supp. 715 (S.D.N.Y. 1977) .....................................................................................25

*Tantaros v. Fox News Network, LLC*,
   12 F.4th 135 (2d Cir. 2021) .............................................................................13, 14, 17, 19

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017) ...............................................................................................7

*Connecticut ex rel. Tong v. Exxon Mobil Corp.*,
   83 F.4th 122 (2d Cir. 2023) .........................................................................................10, 13

*True Velocity Ammunitions, LLC v. Sig Sauer, Inc.*,
   No. 24-cv-522, 2024 WL 4583118 (D. Vt. Oct. 25, 2024)...................................................12

*UDG Mgmt., LLC v. Ironshore Indem. Corp.*,
   No. 24-cv-02777, 2024 WL 1905833 (S.D.N.Y. May 1, 2024) ............................................26

*People ex rel. Underwood v. LaRose Indus. LLC*,
   386 F. Supp. 3d 214 (N.D.N.Y. 2019)................................................................................25

*United Food & Commercial Workers Union, Loc. 919 v. CenterMark Props.*
   *Meriden Square, Inc.*, 30 F.3d 298 (2d Cir. 1994)....................................................................6

*United States v. Chow*,
   993 F.3d 125 (2d Cir. 2021)..............................................................................................20

*United States v. Dagar*,
   No. 24-2239, 2025 WL 2553533 (2d Cir. Sept. 5, 2025) ....................................................20

*Vera v. Saks & Co.*,
   335 F.3d 109 (2d Cir. 2003)..............................................................................................21

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007)..................................................................................................7, 8

*Westchester Cnty. v. Mylan Pharms., Inc.*,
    737 F. Supp. 3d 214 (S.D.N.Y. 2024)............................................................................6

*Williams v. Lockheed Martin Corp.*,
    990 F.3d 852 (5th Cir. 2021) .........................................................................................7

*Willingham v. Morgan*,
    395 U.S. 402 (1969)..................................................................................................7, 8

## Statutes

Removal Clarification Act of 2011,
    Pub. L. No. 112-51 125 Stat. 545 (2011).....................................................................11

1 U.S.C. § 1...........................................................................................................................7

28 U.S.C. § 1331...............................................................................................................6, 13

28 U.S.C. § 1332.................................................................................................................21

28 U.S.C. § 1367...................................................................................................................6

28 U.S.C. § 1441...................................................................................................................6

28 U.S.C. § 1442....................................................................................................2, 7, 11, 12

28 U.S.C. § 1442 (2010) ....................................................................................................11

47 U.S.C. § 543...................................................................................................................15

N.Y. Exec. Law § 63............................................................................................................25

N.Y. Gen. Bus. Law § 353...............................................................................................22, 23

N.Y. Gen. Bus. Law § 353-a................................................................................................24

## Other Authorities

17 C.F.R. § 240.10b5-1................................................................................................ *passim*

David Smith, *Trump Unveils 'Warp-Speed' Effort to Create Coronavirus Vaccine
    by Year's End*, The Guardian (May 16, 2020),
    https://www.theguardian.com/us-news/2020/may/15/trump-coronavirus-warp-
    speed-vaccine-white-house ...........................................................................................3

H.R. Rep. 112–17, pt. 1 (2011)..................................................................................................11

James G. Lundy et al., Foley & Lardner, *N.Y. Attorney Brings Insider Trading
    Case* (Jan. 28, 2026), https://www.foley.com/insights/publications/2026/01/n-
    y-attorney-general-brings-insider-trading-case/ ...........................................................1

Michael A. Asaro et al., Akin Gump, *NYAG Suit Against Former CEO for Insider
    Trading Under Martin Act Signals Greater State Securities Enforcement
    Ahead*, (Feb. 4, 2026), https://www.akingump.com/en/insights/alerts/nyag-
    suit-against-former-ceo-for-insider-trading-under-martin-act-signals-greater-
    state-securities-enforcement-ahead...........................................................................1

Press Release: *Emergent BioSolutions Announces Agreement to Settle Securities
    Class Action Litigation* (Sept. 13, 2024),
    https://investors.emergentbiosolutions.com/node/23091/pdf ...................................24

Reed Brodsky et al., Gibson Dunn, *New York Attorney General Brings Unusual
    Insider Trading Action Relating to CEO's Stock Sales Pursuant to Rule 10b5-
    1 Plan*, (Jan. 20, 2026), https://www.gibsondunn.com/new-york-attorney-
    general-brings-unusual-insider-trading-action-relating-to-ceo-stock-sales-
    pursuant-to-rule-10b5-1-plan/........................................................................ *passim*

Sydney Lupkin, NPR, *Defense Production Act Speeds Up Vaccine Production*
    (Mar. 31, 2021), https://www.npr.org/sections/health-
    shots/2021/03/13/976531488/defense-production-act-speeds-up-vaccine-
    production ...................................................................................................................4

Tami Stark et al., White & Case, *NYAG's Action Against Public Company for
    Approving Executive 10b5-1 Plan Signals New Insider Trading Risk for US
    Issuers*, (Mar. 16, 2026), https://www.whitecase.com/insight-alert/nyags-
    action-against-public-company-approving-executive-10b5-1-plan-signals-new ......................1

U.S. Dep't of Defense, *Immediate Release: Trump Administration Announces
    Framework and Leadership for 'Operation Warp Speed*,' (May 15, 2020),
    https://www.war.gov/News/Releases/Release/Article/2310750/trump-
    administration-announces-framework-and-leadership-for-operation-warp-
    speed/ .........................................................................................................................3

U.S. Dep't of Justice, Office of Public Affairs, *Chairman of Publicly Traded
    Health Care Company Convicted of Insider Trading* (June 21, 2024),
    https://www.justice.gov/opa/pr/chairman-publicly-traded-health-care-
    company-convicted-insider-trading .........................................................................18

## PRELIMINARY STATEMENT

This is a case of first impression and a significant attempt by the New York Attorney General ("NYAG") to meddle in an area governed by federal law.[1]   The Martin Act has existed for more than a century, yet this appears to be the first time the NYAG has brought a civil insider trading action.  Indeed, Plaintiff's Motion to Remand and Memorandum in Support ("Motion") (Dkt. Nos. 13 and 14) fail to cite any such prior actions and instead relies on two inapposite criminal Martin Act cases. Mot. 10.  Notably, the U.S. Securities and Exchange Commission— the federal agency responsible for enforcing Rule 10b5-1 and the very standards Plaintiff invokes—reviewed the same issues and declined to pursue any enforcement action.  *See* Dkt. No. 1, Notice of Removal ("NOR") ¶ 44.

The Complaint demonstrates that this case is rooted in federal law violations.  The twenty-six-page Complaint invokes federal laws, regulations, agencies, and concepts more than ninety times.  *See generally* Compl.  The Complaint discusses Rule 10b5-1, *see* 17 C.F.R. § 240.10b5-1, and the stock trading plan covered by that federal rule forty-three times.  *See generally* Compl. The Complaint alleges federal disclosure law violations,  *See, e.g., id.* ¶ 67,  and the work was

---

[1] This case has caught the attention of several former AUSAs in this District.  *See, e.g.*, Reed Brodsky et al., Gibson Dunn, *New York Attorney General Brings Unusual Insider Trading Action Relating to CEO's Stock Sales Pursuant to Rule 10b5-1 Plan*, (Jan. 20, 2026), https://www.gibsondunn.com/new-york-attorney-general-brings-unusual-insider-trading-action-relating-to-ceo-stock-sales-pursuant-to-rule-10b5-1-plan/; Michael A. Asaro et al., Akin Gump, *NYAG Suit Against Former CEO for Insider Trading Under Martin Act Signals Greater State Securities Enforcement Ahead*, (Feb. 4, 2026), https://www.akingump.com/en/insights/alerts/nyag-suit-against-former-ceo-for-insider-trading-under-martin-act-signals-greater-state-securities-enforcement-ahead; *see also* Tami Stark et al., White & Case, *NYAG's Action Against Public Company for Approving Executive 10b5-1 Plan Signals New Insider Trading Risk for US Issuers*, (Mar. 16, 2026), https://www.whitecase.com/insight-alert/nyags-action-against-public-company-approving-executive-10b5-1-plan-signals-new; James G. Lundy et al., Foley & Lardner,  *N.Y.    Attorney    Brings    Insider    Trading    Case*,    (Jan.    28,    2026), https://www.foley.com/insights/publications/2026/01/n-y-attorney-general-brings-insider-trading-case/.

done amid national security and related concerns that impacted the timing, scope, and manner in which sensitive information was disseminated. *Id.* ¶¶ 86, 120.

The single cause of action centers on Mr. Kramer's company-approved trading plan and the Complaint alleges that Mr. Kramer entered into the plan *because of* a single contamination, which was a direct result of federally-directed vaccine operations under federal government contracts. The NYAG concedes that Mr. Kramer's trading plan provides him with an affirmative defense to the allegation of insider trading. Mot. 2, 12.

Plaintiff's Motion should be denied for three reasons. First, the Court has jurisdiction under 28 U.S.C. § 1442(a)(1), the federal officer removal statute, because Plaintiff's allegations arise from conduct undertaken by Mr. Kramer pursuant to federal direction and oversight by Biomedical Advanced Research and Development Authority ("BARDA") during Operation Warp Speed. Second, the Court has federal question jurisdiction because the Plaintiff's claim necessarily raises substantial federal questions because liability turns on federal securities law standards governing material nonpublic information ("MNPI"), disclosures, and Rule 10b5-1 trading plans. Third, the Court has diversity jurisdiction because Plaintiff seeks individualized relief on behalf of a discrete group of investors, making those investors the real parties in interest for purposes of diversity jurisdiction.

If the Court concludes the existing record does not fully establish the identity of the real parties in interest, Mr. Kramer respectfully requests limited jurisdictional discovery.

## FACTUAL BACKGROUND

### A.    The Global Pandemic & Operation Warp Speed

In the early months of the pandemic, there was no vaccine to protect against COVID-19. Compl. ¶ 23. To address that urgent need, the White House launched Operation Warp Speed ("OWS") in part to develop a possible COVID-19 vaccine. *Id.* OWS involved many federal

2

government agencies, including the Department of Defense ("DoD"), the Department of Health and Human Services ("HHS"), BARDA, the Food and Drug Administration ("FDA"), the National Institutes of Health, and the Centers for Disease Control and Prevention. Dkt. No. 1, NOR ¶¶ 2, 4.

The federal government "refused to accept business-as-usual timelines for vaccines" and sought to "squeeze every last inefficiency out of the process and pour every resource" into an unprecedented effort to produce hundreds of millions of doses of COVID-19 vaccines by January 2021.[2]  Vaccines normally take years to develop and distribute; here, the government sought to accomplish the same in a matter of months.[3]  To develop and produce a vaccine on such a shortened timeline, the federal government enlisted private commercial partners, including Emergent BioSolutions, Inc. ("Emergent"), AstraZeneca, and Johnson & Johnson ("J&J"), among others. Dkt. No. 1, NOR ¶¶ 4, 5. At the time, AstraZeneca's vaccine candidate was in the earliest stages of development, and success was far from certain.  *Id.* ¶ 11.

As part of OWS, in May 2025, BARDA awarded Emergent a $628 million contract to reserve development and manufacturing capacity through the end of 2021 for COVID-19 vaccine candidates.  *Id.* ¶ 5.  Mr. Kramer was the CEO of Emergent for the duration of the contract. Compl. ¶ 17.  AstraZeneca and J&J entered into subcontracts with Emergent under which Emergent provided support for manufacturing efforts for their vaccine candidates, including developing a compliant manufacturing process for AstraZeneca and performing technology transfer and

---

[2] U.S. Dep't of Defense, *Immediate Release: Trump Administration Announces Framework and Leadership for 'Operation Warp Speed*,' (May 15, 2020), https://www.war.gov/News/Releases/Release/Article/2310750/trump-administration-announces-framework-and-leadership-for-operation-warp-speed/.

[3] *See* David Smith, *Trump Unveils 'Warp-Speed' Effort to Create Coronavirus Vaccine by Year's End*, THE GUARDIAN (May 16, 2020), https://www.theguardian.com/us-news/2020/may/15/trump-coronavirus-warp-speed-vaccine-white-house (noting "'Normally, it takes up to 10 years to make a vaccine. A lot of optimism is swirling around a 12-to-18-month time frame, if everything goes perfectly. *We've never seen everything go perfectly*.'").

replication work for J&J.  Dkt. No. 1, NOR ¶¶ 5, 6; Compl. ¶¶ 25-29.  AstraZeneca and J&J remained solely responsible for clinical development.[4]  Like AstraZeneca and J&J, Emergent operated under continuous federal oversight.  Dkt. No. 1 ¶ 6; *see, e.g.*, Exhibit 1 hereto, Contract No. HHSO100201200004I, Task Order No. 75A50120F33007, *Order for Supplies or Services* between ASPR-BARDA and Emergent Manufacturing Operations Baltimore LLC (May 24, 2020) "BARDA Contract" ¶ F.4 (outlining extensive, hands-on oversight of Emergent by BARDA).  The federal government recognized that  Emergent's work was "essential as a matter of national security."  BARDA Contract ¶ H.1.1.

### B.      Federal Government Oversight and the September 2020 Contamination

The government directly oversaw the vaccine development operations, and at times seized control of decisions normally made by Emergent.  For example, the government instructed Emergent in April 2021 to abandon  the production of AstraZeneca vaccine material at Bayview, thereby controlling both the initiation and termination of Emergent's involvement in that vaccine effort.  Compl. ¶ 115.  The government also exercised its powers under the Defense Production Act to take control of Emergent at certain points of the COVID-19 vaccine development process.[5] And the government oversaw facility allocation, production prioritization, and remediation efforts; provided trained subject-matter staff to work at Bayview; directed procurement of equipment, raw

---

[4] Biologic products such as vaccines are developed through a staged, FDA-regulated process. Clinical development—requiring demonstration of safety and efficacy—typically precedes commercial-scale manufacturing, and manufacturing processes are defined and validated over time.  OWS's goal was to compress that multi-year process into a matter of months, requiring development, process design, and scale-up to proceed in parallel.  Emergent's work on the AstraZeneca candidate occurred at that early, development-stage phase, before a manufacturing process had been defined. Dkt. No. 1, NOR ¶ 11.

[5] Sydney Lupkin, NPR, *Defense Production Act Speeds Up Vaccine Production* (Mar. 31, 2021), https://www.npr.org/sections/health-shots/2021/03/13/976531488/defense-production-act-speeds-up-vaccine-production (explaining that, under OWS, "Emergent was required under the Defense Production Act to put vaccine work first," and that "[t]he Defense Production Act helped [Emergent] get to the front of the line on its orders for equipment like bioreactors).

materials, and supplies; and supported logistics for Emergent's OWS work.  *See* Dkt. No. 1, NOR ¶¶ 6, 43.

On or about September 26, 2020, AstraZeneca's development-stage product was contaminated at Emergent's facility.  Compl. ¶ 36.  Federal officials were actively involved in the response to the contamination.  As the Complaint notes, the government participated in at least seven meetings with AstraZeneca and Emergent on how to address the issue so that development could continue.  *Id.* ¶¶ 40, 45, 47, 61, 75, 76, 78, 83.  Federal officials also directed personnel deployment at the facility.  *Id.* ¶ 76 (Sean Kirk relaying that the federal government "ask[ed] [him] to run [B]ayview full time").

### C.    Mr. Kramer's Company-Approved Trading Plan

The Complaint alleges that Mr. Kramer entered into a Rule 10b5-1 trading plan in November 2020 after it was approved by Emergent and its counsel.  *Id.* ¶¶ 50–56.  It alleges that, at the time the plan was approved by Emergent and adopted, Mr. Kramer entered the trading plan *because* he possessed MNPI relating to the September 26, 2020 contamination and Emergent's performance under its federal contracts.[6]  *Id.* ¶¶ 7, 36.  Thus, the Complaint alleges that Mr. Kramer's motive for entering into the trading plan was to sell stock before the public became aware of the contamination, which the NYAG assumes would cause the stock price to drop.  Plaintiff's claim thus directly relates to a federally controlled vaccine development program (in particular the contamination event) and requires the Court to determine whether a contamination constituted MNPI and whether the use of a Rule 10b5-1 plan was permissible under federal law.

---

[6] Mr. Kramer denies that he possessed material nonpublic information when adopting his trading plan.  He also denies that he entered the trading plan because of the contamination event.  References to "material nonpublic information" or "insider trading" reflect Plaintiff's theory only and do not constitute any admission.  In fact, the SEC itself investigated the same trades and found no wrongdoing.  Dkt. No. 1, NOR ¶ 44.

### D.     The NYAG's Settlement with Emergent

On January 15, 2026, the NYAG entered into a settlement agreement with Emergent.  *See* Dkt. No. 1-3, NOR Ex. C (Assurance of Discontinuance between the NYAG and Emergent ("AOD")).  The AOD requires Emergent to implement "enhanced" pre-clearance procedures for Rule 10b5-1 plans and provide quarterly reports to the NYAG regarding Rule 10b5-1 plans adopted by certain officers and directors during the three-year reporting period.  AOD ¶¶ 38–39. These terms represent a blatant attempt by the NYAG to usurp the SEC's authority to regulate trading and disclosures by public companies and their executives.

### STANDARD OF REVIEW

Removal from state court is proper if the federal court has original jurisdiction of the action. 28 U.S.C. § 1441(a).  District courts have original jurisdiction to hear civil actions "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  "The removal process was created by Congress to protect defendants."  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005).  The removing party need only show that there is federal jurisdiction over a single claim to remove the entire action.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005); *see* 28 U.S.C. § 1367(a).  And once a case is properly removed to federal court, the court has no discretion "'to decline the exercise of jurisdiction which is given.'"  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 376 (2012) (citation omitted).

When considering a motion to remand, the Court "'may look outside the pleadings to documents appended to a notice of removal or a motion to remand that convey essential information to the court's jurisdictional analysis.'"  *Westchester Cnty. v. Mylan Pharms., Inc.*, 737 F. Supp. 3d 214, 217 (S.D.N.Y. 2024) (citation omitted); *see also United Food & Commercial Workers Union, Loc. 919 v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 305 (2d Cir.

6

1994) (on jurisdictional issues, federal courts may look outside the pleadings to other evidence in the record).

## ARGUMENT

### I.    REMOVAL IS APPROPRIATE UNDER 28 U.S.C. § 1442(a)(1)

Section 1442(a)(1) permits removal by a "person" who was "acting under" a federal officer, is sued "for or relating to" acts taken under federal direction, and raises a colorable federal defense.  28 U.S.C. § 1442(a)(1); *Agyin v. Razmzan* ("*Agyin*"), 986 F.3d 168, 175 (2d Cir. 2021). Section 1442(a)(1) is to be "'liberally construed'" in favor of removal, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (citation omitted), "'despite the nonfederal cast of the complaint.'" *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (citation omitted); *Agyin*, 986 F.3d at 175 ("Not only must the words of § 1442 be construed broadly but a court also must 'credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer.") (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)). Unlike other removal doctrines, removal under 28 U.S.C. § 1442(a)(1) is not "'narrow'" or "'limited.'" *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (citation omitted); *Texas v. Kleinert*, 855 F.3d 305, 311 (5th Cir. 2017).  Indeed, the Supreme Court has consistently urged against "a narrow, grudging interpretation of § 1442(a)(1)." *See, e.g.*, *Willingham*, 395 U.S. at 407; *Watson*, 551 U.S. at 150; *accord Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021) ("'Unlike the general removal statute, the federal officer removal statute is to be "broadly construed" in favor of a federal forum.'") (citation omitted).

There is no dispute that Mr. Kramer is a "person" within the meaning of section 1442(a)(1), Mot. 6-7, and indeed "person" includes individuals. 1 U.S.C. § 1; *see also Agyin*, 986 F.3d at 174. Plaintiff concedes that Mr. Kramer raises a colorable federal defense.  Mot. 2, 12  At this stage, Mr. Kramer need not prove his federal defense; rather, a federal defense is colorable if it is

7

plausible.  *Willingham*, 395 U.S. at 407; *Latiolais v. Huntington Ingalls Inc.*, 951 F.3d 286, 297 (5th Cir. 2020).  The remaining elements are addressed in turn.

### A.    Mr. Kramer "Acted Under" a Federal Officer

The Supreme Court has held that "acting under" is "broad" and "'must be liberally construed.'"  *Watson*, 551 U.S. at 147 (citation omitted).  Further, the Court must "'credit [the defendant's] theory of the case' when evaluating the relationship between the [defendant's] actions and the federal officer."  *Agyin*, 986 F.3d at 175 (citation omitted); *accord Krandle v. Refuah Health Ctr., Inc.*, No. 22-CV-4977, 2023 WL 2662811, at *8 (S.D.N.Y. Mar. 28, 2023).  "[A]cting under" a federal officer "involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 152.  One situation commonly warranting federal removal is when the government contractor is "helping the Government to produce an item that it needs."  *Id.* at 153; *see also Agyin*, 986 F.3d at 175 ("a private company acting pursuant to a contract with the federal government has this [acting under] relationship"); *accord Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 120 (2d Cir. 2021); *Cuomo v. Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014).  A government contractor acts under the direction of a federal officer when it "help[s] federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, [the contractor] must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract."  *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022).

Indeed, the Sixth Circuit recently held that Moderna's participation in the Operation Warp Speed vaccine development program entitled it to federal officer removal.  *Goins v. Saint Elizabeth Med. Ctr., Inc.*, No. 22-6070, 2024 WL 229568, at *3–4 (6th Cir. Jan. 22, 2024).  The Sixth Circuit found that "Moderna 'co-developed' its COVID-19 vaccine with the federal government: one

agency set the clinical trial protocols, another agency led the trials, and a third agency purchased hundreds of millions of doses of the vaccine and (with two more agencies) coordinated its distribution to retailers." *Id.* at *3. "At each step of the way, Moderna worked under the 'direction and control' of the federal government so that its vaccine would be available quickly." *Id.*

Similarly, Emergent "acted under" federal government agencies during OWS. As the Complaint acknowledges, Emergent "joined the federal government's effort" to develop COVID-19 vaccine candidates. *See* Compl. ¶ 3. The federal government contracted with Emergent to reserve and expand manufacturing capacity to support vaccine development during a national emergency. BARDA Contract ¶¶ C.1, C.2; *id.* ¶ H.1.1 ("The Government recognizes that [Emergent's] operations are essential as a matter of national security."); *see Suncor Energy*, 25 F.4th at 1253 (describing "[w]artime production" contracts as "the paradigmatic example for th[e] special relationship" giving rise to federal officer removal, as opposed to a run-of-the mill government contract for a product already sold on the open market). The contract establishes that Emergent's work was to address an urgent public-health and national security need and required Emergent to develop and scale manufacturing capacity for vaccine candidates. BARDA Contract ¶¶ C.1, C.2, H.1.1

The contract imposed close and continuous federal supervision. *E.g., id.* ¶¶ F.4, H.1.4. Emergent, AstraZeneca, and federal officials were in constant, daily communication, and there were formal bi-weekly and monthly updates from Emergent, quarterly presentations by Emergent, and regular site visits by federal officials. *Id.* ¶ F.4. Beyond those formal deliverables and check-ins, the federal government assigned BARDA personnel to work on-site at Emergent throughout the contract period to provide support and technical consultation. *Id.* ¶ F.4.2. The government also directed core aspects of production such as which COVID-19 vaccine candidates Emergent

would develop, *see id.* ¶ H.1.4, and how many vaccine batches Emergent would prepare each month, *see id.* ¶¶ C.3.1, C.3.2, F.3. The Complaint acknowledges that the federal government was highly involved in the day-to-day work at Emergent's facilities. Compl. ¶¶ 40, 45, 47, 61, 75-76, 78, 83 (outlining the government's control over Emergent's response to the challenges with AstraZeneca).

Like Moderna in *Goins*, Emergent worked at the direction of the federal agencies coordinating OWS and operated under that same federal direction in accelerating vaccine development and manufacturing, including in overseeing Emergent's response to a contamination issue arising during OWS-directed production. And as in *Goins*, Emergent and Mr. Kramer "worked under the 'direction and control' of the federal government so that [the AstraZeneca] vaccine would be available quickly." 2024 WL 229568, at *3–4.

In its Motion, Plaintiff relies on *Connecticut ex rel. Tong v. Exxon Mobil Corp.*, 83 F.4th 122 (2d Cir. 2023). *See* Mot. 7. In that case, the Court of Appeals concluded that Exxon Mobil was not "acting under" the federal government because it had merely agreed to enter into an arm's length business relationship with the government (mineral leases) and, without more, such an arrangement could not be characterized as providing the type of assistance to the government in carrying out its duties "required to trigger the government-contractor analogy." *Tong*, 83 F.4th at 143. Here, in contrast, Emergent was assisting the government with vaccine production on an emergency basis. *See* BARDA Contract ¶ C.1. And unlike Exxon, which could not demonstrate meaningful federal control during the time referenced in the complaint, *Tong*, 83 F.4th at 143–44, Emergent's work was subject to intensive, ongoing federal oversight from agencies including HHS, DoD, FDA, BARDA, all under the umbrella of OWS, and at the time Plaintiff complains of. Dkt. No. 1, NOR ¶¶ 2, 4.

10

**B.    Plaintiff's Claim "Relates To" Federally Directed Work Performed Under Government Contracts**

A defendant may remove under section 1442(a) claims "relating to" the defendant's federally directed actions.  Before its amendment in 2011, § 1442(a)(1) provided for removal by a federal officer (or anyone acting under that officer) "for any act under color of such office."  28 U.S.C. § 1442(a)(1) (2010).  The Removal Clarification Act of 2011 expanded the scope of removal by added the "relating to" language, so the statute now applies to removal "for or relating to any act under color of such office."  Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545, 545 (2011). This new language "broaden[ed] the universe of acts that enable" federal removal, H.R. Rep. 112–17, pt. 1, at 6 (2011), such that there need be only "'a *connection or association* between the act in question and the federal office.'"  *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (citations omitted); *see also Latiolais*, 951 F.3d at 292 ("By the Removal Clarification Act, Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office.").

"[T]he ordinary meaning of the words 'relating to' is a broad one."  *Latiolais*, 951 F.3d at 292 (cleaned up); *see Agyin*, 986 F.3d at 174 n.2.  To satisfy the "relating to" requirement in section 1442(a), a federal officer need only show that "the claim has a connection or association with government-directed conduct."  *Suncor Energy*, 25 F.4th at 1251; *see Goins*, 2024 WL 229568, at *4 (for purposes of federal officer removal, claims for negligence, battery, and negligent hiring were sufficiently "related to" the COVID-19 vaccine manufactured by Moderna pursuant to its government contract as part of Operation Warp Speed).

Courts do not require that the government direct the precise conduct giving rise to liability. *See, e.g.*, *Sawyer*, 860 F.3d at 258 (holding that the defendant need not show that the claim is the result of a "specific government direction" for federal officer removal).  As the Second Circuit has

11

explained, the "hurdle erected" by § 1442(a)(1) is "quite low." *Isaacson*, 517 F.3d at 137 . The statute "'does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority.'" *Id.* (citation omitted); *see also Krandle*, 2023 WL 2662811, at *10–11 (finding federal officer removal appropriate where the federal government did not direct the conduct that led to the alleged torts). Instead, it is sufficient for the defendant to show that "'the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government.'" *True Velocity Ammunitions, LLC v. Sig Sauer, Inc.*, No. 24-cv-522, 2024 WL 4583118, at *4 (D. Vt. Oct. 25, 2024) (quoting *Isaacson*, 517 F.3d at 137). In *Isaacson*, the court held that removal is proper even where the alleged harm resulted from conduct "not specifically contemplated" by the government, so long as the government relationship "gave rise to" the conduct at issue. *Id.* at 138.

Here, Plaintiff alleges Mr. Kramer adopted a Rule 10b5-1 plan *because of* MNPI about a contamination event affecting AstraZeneca's COVID-19 vaccine candidate. *See* Compl. ¶¶ 87, 120. Emergent's efforts to address that contamination event—the MNPI that the Complaint alleges that Mr. Kramer possessed—was taken pursuant to close federal supervision. *See* Compl. ¶¶ 40, 45, 47, 61, 75-76, 78, 83. In other words, Mr. Kramer's alleged possession of MNPI, "'the acts for which [he is] being sued,'" occurred "'*because of* what [he was] asked to do by the Government,'" specifically, to address the contamination event. *True Velocity*, 2024 WL 4583118, at *4 (quoting *Isaacson*, 517 F.3d at 137). The NYAG alleges Mr. Kramer *used* information stemming from federally overseen vaccine-development operations when he adopted his trading plan. Thus, Plaintiff's claim "relates to" to the work Mr. Kramer performed for OWS and BARDA.

12

Plaintiff's reliance on *Exxon* is misplaced.  *See* Mot. 7–8 (citing *Tong*, 83 F.4th at 130–32, 143–45).  There, the state unfair trade practices claims did not relate to Exxon's extraction of oil and gas from land leased from the federal government or from Exxon's provision of fuel to the U.S. military.  The Second Circuit found a "total mismatch" between Exxon's federally connected activity—fossil fuel production—and the challenged conduct—advertising and public-relation campaigns.  *Tong*, 83 F.4th at 145.  Plaintiff, by contrast, alleges Mr. Kramer traded while in possession of information concerning contamination issues at Emergent's facilities. Compl. ¶ 1. But those alleged issues arose directly from Emergent's federally-directed vaccine development— the source of the very information on which Plaintiff's claim depends.  *See generally* BARDA contract.  Thus, unlike *Exxon*, Plaintiff's claim relates to Mr. Kramer's work for the federal government.

## II.    REMOVAL IS APPROPRIATE BECAUSE THE COURT HAS FEDERAL QUESTION JURISDICTION

Federal question jurisdiction, 28 U.S.C. § 1331, provides an independent basis for denying the Motion.  A complaint that does not allege a federal cause of action may nonetheless "arise under" federal law for purposes of § 1331 if the federal issue is: (1) necessarily raised by the state law claim, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Gunn v. Minton,* 568 U.S. 251, 258 (2013) (the "*Grable/Gunn* exception").  Here, the Complaint's Martin Act claim meets all four elements of the *Grable/Gunn* exception.

### A.    The Martin Act Claim Necessarily Raises Federal Issues

A state law claim "necessarily raises" a federal question where the plaintiff's right to relief necessarily depends on resolution of a question of federal law.  *Tantaros v. Fox News Network,*

*LLC*, 12 F.4th 135, 141 (2d Cir. 2021).  "In other words, federal jurisdiction exists if a court must apply federal law to the plaintiff's claim in order to decide the case."  *Id.*  In making this assessment, courts must focus on what appears in "'plaintiff's statement of *his own* claim.'"  *Id.* (citation omitted, emphasis added).  Federal question jurisdiction exists, for example, where "the central premise" of a state-law claim is that the defendant violated a section of the Exchange Act, *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 102 (2d Cir. 2001); or breached the terms of a tariff created by federal law, *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998); or where the state law itself "simply makes illegal any violation" of a federal statute, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 578 U.S. 374, 383 (2016) (internal quotation marks omitted).  A plaintiff seeking relief in those situations "must undertake to prove, as the cornerstone of [its] suit, that the defendant infringed a requirement" of federal law.  *Id.*

Here, Plaintiff's sole claim necessarily turns on federal securities law.  The Complaint alleges insider trading by adopting a Rule 10b5-1 plan while in possession of MNPI.  Compl. ¶¶ 1, 87.  And the alleged MNPI relates to FDA regulations governing the development of vaccines.  *Id.* ¶¶ 38 & n.4, 109 (referring to "[n]ew speculation that the FDA may not approve the AZ vaccine" in late-February 2021), 115 ("[O]n April 16, [2021], the FDA requested that Emergent shut down the production of [AstraZeneca's candidate]").  Thus, the claims are "rooted in violations of federal law, which favors a finding that federal question jurisdiction exists."  *D'Alessio*, 258 F.3d at 101, 102-03 (finding federal question jurisdiction where defendant's "alleged violations of the federal securities laws and its improper interpretation of those laws underlie [plaintiff's] state law claims.");*id.* at 102-03 (holding complaint necessarily raised federal law because claims "require[d] a court to construe federal securities laws" and "monitor[] [defendant's] compliance with those laws"); *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank N.A.* ("*Jacobson*"), 824

14

F.3d 308, 317 (2d Cir. 2016) ("[T]o establish a false statement or record within the meaning of the [state statute], [plaintiff] must prove at least that the trusts did not qualify under federal law.").

Rule 10b5-1 governs when a trading plan may be adopted and what constitutes impermissible plan adoption while aware of MNPI. *See* 17 C.F.R § 240.10b5-1; *see In re Regeneron Pharms., Inc.* ("*Regeneron*"), Nos. 25-cv-05056 et al., 2026 WL 734839, at *4 (S.D.N.Y. Mar. 16, 2026) (finding plaintiffs' state law claims turn on whether company ran afoul of federal law because "all of the complaints are rooted in allegations that Regeneron reported inflated [Average Sales Price] numbers" and "it is a federal statute (together with federal regulations) that governs the calculation of ASP)".[7]  To prevail, Plaintiff must prove that the information at issue was both material and nonpublic at the time of plan adoption, *see* Compl. ¶¶ 1, 12, 81, 86, 87, 118, 120—determinations governed by federal law, including whether a reasonable investor would view the information as altering the "total mix" and whether it had been disclosed to the investing public through disclosures filed with or governed by the SEC. *See, e.g.*, *SEC v. Brewer*, No. 20-cv-06175, 2025 WL 1548765, at *9–10 (S.D.N.Y. May 30, 2025); *cf. Jacobson*, 824 F.3d at 317–18; *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70, 78-79 (S.D.N.Y. 2022). Because liability turns on whether trading plan adoption violated Rule 10b5-1, this case necessarily raises a disputed and substantial federal issue under *Grable*.  *See Jacobson*, 824 F.3d at 317–18; *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) (holding the "claims 'necessarily raise[d] [the] stated federal issue' of whether [defendant] violated 47 U.S.C.

---

[7] Under 17 C.F.R. § 240.10b5-1(c)(1), an entity that trades securities in the possession of material, non-public information does not violate § 10(b) of the Securities Exchange Act if three conditions are met. First, the person must have entered into a "binding contract" executed "before becoming aware of the [material] information."  17 C.F.R. § 240.10b5-1(c)(1)(i)(A).  Second, the "binding contract" must fix a price term and/or trade date such that the trade is final and cannot be altered by the parties.  17 C.F.R. § 240.10b5-1(c)(1)(i)(B).  Third, the contract must truly be binding.  17 C.F.R. § 240.10b5-1(c)(1)(i)(C).

§ 543(d) . . . [plaintiff's] claim[ed] that [defendant] breached a contract term consisting of § 543(d) incorporated by reference").

### B.    There Is a Dispute Regarding Compliance with 17 C.F.R. § 240.10b5-1

The second requirement is that the federal issue must be "actually disputed." *Gunn*, 568 U.S. at 258–59; *see Grable*, 545 U.S. at 314. *Grable*'s second prong is satisfied not only when the parties "disagree over the interpretation of a statute or regulation," but also when the parties "disagree over whether there has been compliance with or violation of federal law." *Barone v. Bausch & Lomb, Inc.*, 372 F. Supp. 3d 141, 148 (W.D.N.Y. 2019); *see also Jacobson*, 824 F.3d at 317 ("[T]o establish a false statement or record within the meaning of the [state statute], [plaintiff] must prove at least that the trusts did not qualify under federal law. Further, this issue is obviously disputed, as the central premise of [defendant's argument] was that the trusts did qualify under federal law, properly interpreted."); *Regeneron*, 2026 WL 734839, at \*4 (finding federal issues were "actually disputed" because "liability for the plaintiffs' state law claims turn on whether Regeneron violated federal law governing ASP calculations"); *see Broder*, 418 F.3d at 195 (federal issue actually disputed because parties disputed whether defendant violated federal statute); *N.Y.C. Health & Hosps. Corp. v. WellCare of N.Y., Inc.*, 769 F. Supp. 2d 250, 256–57 (S.D.N.Y. 2011) (rejecting argument that "'there can be no dispute regarding the interpretation'" of the applicable federal regulation and finding actually disputed federal issue because defendant rejected plaintiff's characterization) (citation omitted); *Barone*, 372 F. Supp. 3d at 148.[8]

---

[8] *Callahan v. Sw. Airlines Co.*, No. 18-cv-10563, 2018 WL 5849476, at \*5 (D. Mass. Sept. 26, 2018) (finding federal issue "actually disputed" where complaint alleged violations of federally-mandated requirements in federal regulations and defendant disputed whether plaintiffs could base state claims on violations of those federal regulations and extent to which it violated those regulations), *report and recommendation adopted*, 2018 WL 5846819 (D. Mass. Nov. 7, 2018); *Mihok v. Medtronic, Inc.*, 119 F. Supp. 3d 22, 27 (D. Conn. 2015) (finding federal issue "necessarily raise[d]" and "actually disputed" where plaintiff's state law claims challenging the safety of an FDA-approved medical device were "plainly grounded in [d]efendants' alleged violations of the federal CGMP requirements").

Plaintiff asserts that Mr. Kramer's Rule 10b5-1 plan did not comply with 17 C.F.R. § 240.10b5-1 and that Plaintiff therefore should be awarded damages, civil penalties, and costs. Mr. Kramer contends that his Rule 10b5-1 plan did not violate 17 C.F.R. § 240.10b5-1. *See Broder*, 418 F.3d at 195 (finding federal issue was "actually disputed" because defendant "maintain[ed] that its provision of Winter Season rates did not violate" the relevant federal law). Thus, there is an actual disputed issue, satisfying the second prong of *Grable*.

### C.      The Federal Issues Are Substantial

The federal issues raised are "substantial" and important "to the federal system as a whole." *Gunn*, 568 U.S. at 260, 262.  "Substantiality" "indicat[es] a serious federal interest in claiming the advantages thought to be inherent in a federal forum" and "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312–13.  The Supreme Court and the Second Circuit have found a significant federal interest in the interpretation of a federal law in disputes over duties imposed by the Securities Exchange Act, *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1024 (2d Cir. 2014); the meaning of a federal tax law, *Grable*, 545 U.S. at 315; the scope of an Internal Revenue Code Regulation, *Jacobson*, 824 F.3d at 318; and the impact of the FAA's prohibition on mandatory arbitration clauses, *Tantaros*, 12 F.4th at 146.

This suit implicates several substantial federal interests that justify a federal forum.  *See NASDAQ*, 770 F.3d at 1024 (holding that the question "whether NASDAQ violated its Exchange Act obligation[s]" was "sufficiently significant to the development of a uniform body of federal securities regulation" to be substantial); *Regeneron*, 2026 WL 734839, at *4 (concluding federal issues were "substantial" because they "'implicate a complex federal regulatory scheme,' *i.e.*, Medicare").  First, the NYAG seeks to impose liability on Mr. Kramer for his alleged non-

17

compliance with 17 C.F.R. § 240.10b5-1.[9]  Company executives rely upon Rule 10b5-1 plans to sell stock pursuant to predetermined trades, allowing them to later trade securities even though they may be in possession of MNPI at the time of such trades.  *See Jacobson*, 825 F.3d at 317 (holding federal issue was substantial because "[a] [Real Estate Mortgage Investment Conduit] is a creature of federal law that accords favorable tax treatment to investments" and the goal of that law was to "provide clear rules" on the tax treatment of mortgage-backed securities).  If Plaintiff is allowed to proceed, her claims raise the specter of Mr. Kramer, and other insiders across the country, being subject to conflicting obligations as states impose disparate requirements.  *Id.* at 317–18.

Second, recent federal enforcement actions underscore the substantial federal interests at stake.  Federal courts are actively defining the contours of Rule 10b5-1 plan compliance, including what constitutes good faith adoption of trading plans and how MNPI considerations apply in practice.  And the SEC has developed detailed regulations regarding trading plans that include not only the trading plan but reporting to the SEC about such plans.  Just last year, the federal government secured a conviction in its first insider trading case based exclusively on a Rule 10b5-1 plan.  *See* U.S. Dep't of Justice, Office of Public Affairs, *Chairman of Publicly Traded Health Care Company Convicted of Insider Trading* (June 21, 2024), https://www.justice.gov/opa/pr/chairman-publicly-traded-health-care-company-convicted-insider-trading.  The SEC also reviewed Mr. Kramer's trading activity at issue in this case and declined to bring any enforcement action.  Dkt. No. 1, NOR ¶ 44.

---

[9] The NYAG's Assurance of Discontinuance with Emergent confirms that the NYAG is trying to step into the role of the SEC.  The AOD (Dkt. No. 1-3, NOR Ex. C ¶¶ 1, 15) defines the alleged misconduct by reference to Rule 10b5-1 and federal law governing MNPI.  It then concludes that Mr. Kramer's trading plan was not adopted "in good faith" because it was entered into while in possession of MNPI and thus in violation of 17 C.F.R. § 240.10b5-1.  *Id.* ¶ 28.

Third, if Plaintiff prevails on its claim and a state court agrees that Mr. Kramer's plan did not comply with 17 C.F.R. § 240.10b5-1, that ruling will have sweeping consequences for the enforcement powers of federal regulators and prosecutors, the scope of a state's authority to regulate these plans, and the potential liability of thousands of executives who have adopted such plans. *NASDAQ*, 770 F.3d at 1028, 1050 (holding that the federal issues were substantial because "resolution of the disputed federal law issue [t]here would likely have far-reaching prospective consequences for the operation of national securities exchanges"). This case would allow state attorneys general to step into the shoes of the SEC while avoiding federal judicial review. If a New York state court holds that the NYAG can exploit Martin Act claims based on insider trading, that decision would fundamentally alter the enforcement landscape of federal and state agencies.

**D.      Exercising Jurisdiction Will Not Disrupt the Federal-State Judicial Balance**

Removal of this case will not disrupt the "congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314; *see Jacobson*, 824 F.3d at 316 ("[F]ederal questions that implicate substantial federal interests will often be appropriately resolved in federal rather than state court."). This prong of the *Grable* test focuses on "'the nature of the claim, the traditional forum for such a claim, and the volume of cases that would be affected.'" *Tantaros*, 12 F.4th at 146 (quoting *Jacobson*, 824 F.3d at 316).

The nature of Plaintiff's insider trading claims is inherently federal and traditionally resolved in federal court. They are not claims of the "'sort ordinarily resolved in state courts'." *Link Motion Inc. v. DLA Piper LLP*, 103 F.4th 905, 916 (2d Cir. 2024) (citation omitted); *see Arm or Ally*, 644 F. Supp. 3d at 82–83. Indeed, to undersigned counsel's knowledge, this is the first civil insider trading case brought by the NYAG in the more than one-hundred-year existence of the Martin Act. Federal courts, especially in this District, routinely adjudicate disputes involving insider trading. The Second Circuit also has recognized that if a "defendant is charged with an

19

offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate." *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021); *see also United States v. Dagar*, No. 24-2239, 2025 WL 2553533, at *2–3 (2d Cir. Sept. 5, 2025).

The volume of cases that would be affected by exercising federal jurisdiction is low. Contrary to the NYAG's invocation of two *criminal* Martin Act cases (Mot. 10 (citing *People v. Napolitano*, 282 A.D.2d 49, 51 (1st Dep't 2001) and *People v. Florentino*, 116 Misc. 2d 692, 692–93 (Crim. Ct. N.Y. Cnty. 1982))—neither of which involved Rule 10b5-1 plans—the NYAG has never pursued a civil insider trading enforcement action against an executive who used a Rule 10b5-1 plan.

Finally, permitting a state court to define the scope of Rule 10b5-1 would risk inconsistent interpretations of a federal regulatory safe harbor that demands uniformity.  Corporate insiders operate in national markets governed by a single federal framework; subjecting them to state-by-state interpretations of when a trading plan may be adopted would create uncertainty and conflict with 17 C.F.R. § 240.10b5-1's design.  Allowing this case to proceed in federal court, by contrast, ensures that Rule 10b5-1 is interpreted consistently with federal precedent and the SEC's regulation.

> **E.      Plaintiff's "Federal Defense" Argument Mischaracterizes the Issues**

Plaintiff makes little effort to deny this case turns on disputed questions of federal law and instead devotes the majority of its argument explaining why Mr. Kramer cannot remove this case based on a federal defense.  Mot. 12–13.  But the Complaint makes Mr. Kramer's stock trading plan and application of 17 C.F.R. § 240.10b5-1 indispensable to proving Martin Act liability.  The Complaint requires the court to decide whether the plan was unlawful when adopted.  To do so, the court must also determine whether the alleged contamination issue was material—which turns on federal law, federal contracts, and FDA regulations.  Thus, federal law and regulation is the

source of the duty Plaintiff alleges Mr. Kramer breached.  Plaintiff is bound by the Complaint's allegations and cannot recharacterize them through a motion to remand.  *See Vera v. Saks & Co.*, 335 F.3d 109, 116 n.2 (2d Cir. 2003) ("Although plaintiff now tries to disavow or at least minimize [a certain] allegation, we generally evaluate a defendant's right to remove a case to federal court at the time the removal notice is filed.").

## III.    THIS COURT HAS ORIGINAL DIVERSITY JURISDICTION OVER THIS ACTION

This Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000, and the individuals whom the NYAG purports to represent—New York citizens who were investors in Emergent—are citizens of different states than Mr. Kramer, a citizen of Michigan.  Compl. ¶ 34; *see Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 220–21 (2d Cir. 2006).  The Complaint identifies the real parties in interest as "New York investors, including New York State employee retirement funds" that "bought, sold, and held hundreds of thousands of shares in Emergent stock during the relevant period."  Compl. ¶ 21.

For diversity purposes, courts look to the citizenship of the parties with a "real and substantial" interest in the controversy.  *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460–61 (1980); *Louisiana ex rel. Guste v. Fedders Corp.*, 524 F. Supp. 552, 556 (M.D. La. 1981).  When a state sues as a nominal or statutory representative rather than as the "real party in interest," the state's presence does not destroy diversity.  *See Ex parte Nebraska*, 209 U.S. 436, 444–46 (1908); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014); *see also Dep't of Fair Emp. & Housing v. Lucent Techs., Inc.*, 642 F.3d 728, 737 (9th Cir. 2011).

21

### A.    The Complaint Seeks Redress for Harm to New York Citizens

To determine whether the state is the real party in interest, courts consider "the essential nature and effect of the proceeding." *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1988) (internal quotation marks omitted).  For example, when a state files suit seeking redress on behalf of "a circumscribed group of its citizens," those citizens are the real parties in interest and their citizenship determines whether there is diversity jurisdiction.  *Connecticut v. Chubb Grp. of Ins. Cos.*, No. 11-cv-00997, 2012 WL 1110488, at \*2–4 (D. Conn. Mar. 31, 2012) (finding complaint alleging defendant violated state labor laws removable); *see also Connecticut Comm'r of Lab. v. AT&T Corp.*, No. 06-cv-01257, 2006 WL 3332982, at \*2–3 (D. Conn. Nov. 16, 2006) (finding the real party in interest was Connecticut's citizens, not the state, since complaint referenced a specific group of individuals).

This action is brought for the benefit of a defined group of investors.  The Complaint expressly identifies New York investors and New York State employee retirement funds that purchased Emergent securities during the relevant period.[10]  Compl. ¶ 21; *see also id.* ¶ 110 (discussing "the significance of AZD1222 and Emergent's manufacturing difficulties to investors."); *id.* ¶ 122 (describing alleged misconduct "as a fraud upon the purchaser.").  Plaintiff seeks disgorgement measured by trading profits, damages measured by investor losses,[11] and

---

[10] In cases in which courts have exercised diversity jurisdiction over state enforcement actions, courts generally have not inquired into the citizenship of each of the real parties in interest but, instead, have presumed the state is limited to representing its own citizens. *See, e.g.*, *Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 748–51 (N.D. Ohio 2011); *Guste v. Fedders Corp.*, 524 F. Supp. at 557–58.  There is no reason to question that presumption here.  N.Y. Gen. Bus. Law § 353(1).

[11] In its Motion, the NYAG now argues it is *not* seeking damages.  *Compare* Mot. 16 , *with* Compl., Prayer for Relief (C) (demanding that the Court issue an order and judgment "[d]irecting Defendant Kramer to pay ***damages*** caused, directly or indirectly, by the fraudulent and deceptive acts complained of herein.").

22

injunctive relief that operates only in favor of market participants—not the State as a sovereign. Compl., Prayer for Relief.

Further, the Complaint is based upon the Martin Act, under which the NYAG is acting only as a statutory representative, not as a real party in interest. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia*, 311 F. Supp. 149, 155–56 (S.D.N.Y. 1970) (holding in suit over the assets of a fraudulent securities dealer, state was not real party in interest for Martin Act claim because remedies sought could go to a group of New York citizens who had been defrauded rather than wholly to the state). Section 353 of the Martin Act expressly empowers the NYAG, upon believing that any person "has engaged in, is engaged or is about to engage in any . . . fraudulent practices, [s]he may bring an action ***in the name and on behalf of the people of the state of New York*** against such person . . . ." N.Y. Gen. Bus. Law § 353(1) (emphasis added). This language "negates any notion that the state as such has a real interest in the controversy." *Cavicchia*, 311 F. Supp. at 156.

## B.    The Complaint Seeks to Address Investor Harm

To be a real party in interest, a state must seek relief that "inures to it alone," such that a judgment would operate in the state's favor as a sovereign—not merely as a conduit for private recovery. *Missouri , Kan. & Tex. Ry. Co. v. Hickman*, 183 U.S. 53, 59 (1901). Here, the relief sought, at least in part, would inure to the benefit of New York investors. Specifically, the Complaint seeks injunctive relief that would benefit New York investors, disgorgement measured by alleged trading profits, damages measured by investor losses—relief that mirrors the damages sought in a private securities fraud action, and nominal claims for $2,000 of civil penalties and injunctive relief. *See* Compl., Prayer for Relief.

Only market participants stand to benefit, if at all, from any prospective injunctive relief, and the NYAG does not, and cannot, show a "substantial state interest" in this requested relief.

23

*Lucent Techs., Inc.*, 642 F.3d at 739. Courts have rejected arguments that requests for injunctive relief render the state the real party in interest for diversity purposes. *See, e.g.*, *id.* (rejecting argument that state agency is the "real party in the controversy for the purposes of diversity jurisdiction" because it requested injunctive relief); *see also Cavicchia*, 311 F. Supp. at 156–57; *Guste*, 524 F. Supp. at 557.

As to the disgorgement and damages sought, those remedies could benefit harmed investors who purchased Emergent securities during the relevant period. *See* N.Y. Gen. Bus. Law § 353-a (the provision of the Martin Act providing a path to recovery for individuals harmed); *Cavicchia*, 311 F. Supp. at 156–57. Indeed, Emergent has already resolved shareholder class action arising from the same alleged course of conduct. Order, *In re Emergent BioSolutions Inc. Secs. Litig.*, No. 21-cv-955 (D. Md. Feb. 27, 2025), Dkt No. 213; Press Release: *Emergent BioSolutions Announces Agreement to Settle Securities Class Action Litigation* (Sept. 13, 2024), https://investors.emergentbiosolutions.com/node/23091/pdf. To the extent the NYAG now seeks monetary relief on behalf of New York investors for those same losses, this action functions as an effort to obtain a duplicative recovery for private parties. Finally, the NYAG's nominal claims for $2,000 of civil penalties and injunctive relief does not transform it into a real party in interest. *See Cavicchia*, 311 F. Supp. at 155 ("[T]he mere fact that the state has some pecuniary or beneficial interest in the matter is not conclusive.").

## C.    There Is No "Real and Substantial" State Interest

The NYAG attempts to manufacture a substantial state interest in "securing an honest marketplace" based on its authority under the Martin Act and the State's purported "exclusive authority" to prosecute securities fraud. Mot. 8–9, 14–16. But those asserted interests are generalized regulatory interests—not sovereign injuries. *Cavicchia*, 311 F. Supp. at 156; *see also*

24

*Missouri Ry.*, 183 U.S. at 60 (explaining a state is just a nominal party where its interest is merely a "general government interest" in "secur[ing] compliance with the law").[12]

The NYAG claims that "[i]t is well-settled that the State's goal of securing an honest marketplace in which to transact business is a quasi-sovereign interest." Mot. 15. But the cases on which the NYAG relies are distinguishable, as they involved direct state intervention to halt ongoing or widespread business practices affecting consumers broadly. *See, e.g.*, *New York ex rel. Abrams v. Gen. Motors Corp.*, 547 F. Supp. 703, 703-04 & n.4 (S.D.N.Y. 1982) (holding State was the real party in interest in New York Executive Law section 63(12) suit alleging "repeated and persistent fraudulent and illegal business practices in connection with [GM's] sale" of transmissions with "serious problems and defects"); *People ex rel. Underwood v. LaRose Indus. LLC,* 386 F. Supp. 3d 214, 218 (N.D.N.Y. 2019) (holding State was the real party in interest in action "'to protect children in New York from toys containing lead'") (citation omitted). But the NYAG fails to establish how the present action—focused solely on the alleged wrongful adoption of a Rule 10b5-1 plan by one retired executive more than five years ago—vindicates the State's asserted interest in securing an honest marketplace. The NYAG's novel attempt to interfere with the federal regulatory scheme of 10b5-1 plans, via a Martin Act claim never before used to pursue a civil insider trading action, does not afford the State real party in interest status.

Further, these purported state interests are not pleaded in the Complaint, which does not include any references to an honest marketplace or proper business practices. *See generally*

---

[12] *See also Grace Ranch, LLC v. BP Am. Prod. Co.*, 989 F.3d 301, 313 (5th Cir. 2021) ("Louisiana's interest in environmental regulation" is a "general governmental interest" and "does not make the State a real party in interest."); *Lucent Techs., Inc.*, 642 F.3d at 737 ("[G]eneral governmental interest[s] will not satisfy the real party to the controversy requirement for the purposes of defeating diversity."); *Ramada Inns, Inc. v. Rosemount Mem'l Park Ass'n*, 598 F.2d 1303, 1307 (3d Cir. 1979) ("[S]tate's general 'governmental interest in the welfare of all its citizens'" does not establish state as "a real party in interest.") (citation omitted); *see also Skandia Am. Reins. Corp. v. Schenck*, 441 F. Supp. 715, 722 (S.D.N.Y. 1977).

25

Compl.  The NYAG's argument is nothing more than a *post hoc* attempt to rewrite its pleading to manufacture a state interest in this action and should be rejected.  *Cf. Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 368 (S.D.N.Y. 2006) ("[T]he propriety of removal is to be determined by the pleadings at the time of removal").

## IV.    IN THE ALTERNATIVE, MR. KRAMER SHOULD BE ALLOWED LIMITED DISCOVERY ON JURISDICTION

Here, for removal purposes, jurisdiction exists based on the facts already before the Court. However, to the extent that the Court disagrees, jurisdictional discovery is warranted prior to a remand. When weighing a potential remand, courts routinely grant limited and targeted jurisdictional discovery where jurisdictional facts are contested or more facts are needed to determine if jurisdiction exists. *See Anwar v. Fairfield Greenwich Ltd.*, No. 09-cv-0118, 2009 WL 1181278, at *3 (S.D.N.Y. May 1, 2009) (quoting *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 155 (2d Cir. 1996))  ("[W]hen a plaintiff moves to remand an action to state court after a defendant has removed it to federal court, a district court 'may have . . . to authorize . . . discovery' on the issue of subject matter jurisdiction."); *see also, e.g., Bd. of Managers of 17 Battery Place Condo. v. Twin City Fire Ins. Co.*, No. 24-cv-9972, 2025 WL 804830, at *2 (S.D.N.Y. Mar. 12, 2025) (authorizing jurisdictional discovery).

Jurisdictional discovery is warranted as to diversity to determine the citizenship of the real parties in interest. *Cf. Bd. of Managers of 17 Battery Place Condo*, 2025 WL 804830, at *2; *UDG Mgmt., LLC v. Ironshore Indem. Corp.*, No. 24-cv-02777, 2024 WL 1905833, at *2 (S.D.N.Y. May 1, 2024).  Plaintiff's theory depends on individualized investor harm because the Complaint seeks monetary relief tied to investor losses that mirrors the relief afforded in private securities claims.  Targeted discovery could therefore establish facts regarding who would receive any damages recovered in this action, including whether funds would flow to the state or flow directly

26

or indirectly to investors; the identity and citizenship of those investors; and the overlap of investors with prior class actions and whether investors already recovered or released claims.

## CONCLUSION

For the foregoing reasons, as well as those stated in the Notice of Removal, Mr. Kramer respectfully requests that the Court deny Plaintiff's Motion.

Dated: April 10, 2026
      Washington, DC

Respectfully submitted,

*/s/ Kirby D. Behre*
Kirby D. Behre (*admitted pro hac vice*)
kbehre@milchev.com
**MILLER & CHEVALIER CHARTERED**
900 16th Street Northwest
Washington, DC 20006
Telephone: (202) 626-5960
Facsimile: (202) 626-5801
Alexandria M. Westbrook (NYSB #6168736)
awestbrook@milchev.com
Telephone: (202) 626-6049
Robert Cetrino (*pro hac vice motion forthcoming*)
rcetrino@milchev.com
Telephone: (202) 626-1572
Jesse Schwab (*pro hac vice motion forthcoming*)
jschwab@milchev.com
Telephone: (202) 626-5946

Roland G. Riopelle (NYSB #2068161)
rriopelle@sercarzandriopelle.com
**SERCARZ & RIOPELLE, LLP**
950 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 586-4900
Facsimile: (212) 586-1234

*Attorneys for Defendant Robert G. Kramer*

27

## WORD COUNT CERTIFICATION

In accordance with Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Individual Practices, I hereby certify that the Memorandum of Law in Opposition to Plaintiff's Motion to Remand contains 8,742 words (including footnotes), exclusive of cover page, tables of contents and authorities, and signature block, as established using the word count function of Microsoft Word.

Dated: April 10, 2026                              */s/ Kirby D. Behre*
      Washington, DC                              Kirby D. Behre